THE CITY OF HARTFORD vs. STEPHEN MASLEN ET AL.

First Judicial District, Hartford, January Term, 1904.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The parties were at issue respecting the right of the State to authorize the erection of a soldiers' memorial upon a strip of land in the city of Hartford lying south of the driveway in front of the Capitol ; the city claiming said strip as a part of one of its public parks, while the defendants alleged that it had been tendered by the city and accepted and occupied by the State as a part of the Capitol grounds. *Held :* —

1. That in the absence of a deed or other written conveyance by the city to the State, resolutions of the General Assembly authorizing the city to provide a site for the Capitol free of expense to the State, and other Special Acts relating thereto and to the erection of the building and the grading of the grounds, also the votes and proceedings of the municipal authorities pursuant to such author-

ity, the action of the agents of the State and city in the premises, and the possession and control actually taken and exercised by the State over the strip in dispute for more than twenty years, with the knowledge and acquiescence of the city, were not only admissible in support of the defendants' contention, but were sufficient as matter of law to constitute an express or implied dedication and transfer of the control of said strip by the city to the State.

2. That the city had authority to devote the strip of land in question to the use made of it by the State, and for which it was accepted, such use being consistent with its continued use as a public park.

3. That if the State's use could be regarded as inconsistent with that to which the land was originally dedicated, the legislature nevertheless had power to authorize the city to devote it to such other and higher public purpose as would render its enjoyment more extended and general.

4. That such authority from the State was sufficiently shown by the resolutions of the legislature and the fact that the land was tendered to, and accepted by, the State itself.

5. That no deed or written conveyance was required in order to render such transfer or dedication to the State effective.

6. That the erection of the memorial in question was a proper exercise of the right of control so surrendered by the city to the State.

7. That after its erection upon the Capitol grounds, the memorial would become the sole property of the State.

The city claimed that the tender of land which was accepted by the State was one made in lieu of, not in addition to, the original tender, and did not include the strip in question.   *Held :* —

1. That testimony of persons present at a city meeting, as to what matters were discussed there, was not admissible as traditionary evidence of the general understanding of the citizens respecting the substitution of one site for the other ; nor was an article in a daily paper of that date admissible for such purpose.

2. That if offered to prove that the second tender was in fact expressly made in lieu of the first, this evidence was properly excluded as hearsay.

Traditionary evidence concerning facts of general interest affecting public or private rights is limited to proof of declarations of decedents, or persons supposed to be dead or unavailable as witnesses, as to ancient rights of which they are presumed or shown to have had competent knowledge, and which are incapable of proof in the ordinary way by living witnesses ; and this exception to the admission of hearsay evidence is not to be favored or extended.

Argued January 8th—decided April 15th, 1904.

SUIT to restrain the erection of a soldiers' memorial·upon land designated for that purpose by the State, but alleged

to be owned by the plaintiff, brought to and tried by the Superior Court in Hartford County, *Roraback, J.;* facts found and judgment rendered for the defendants, and appeal by the plaintiff. *No error.*

This action involves the right of the State, under a resolution of the General Assembly and without authority from the plaintiff, to cause a certain memorial, commemorative of the services rendered by the First Connecticut Heavy Artillery in the Civil War, consisting of a famous mortar suitably mounted and supported by a stone foundation, to be erected upon land a short distance northeast of the Capitol at Hartford.

The land upon which it is proposed to erect the memorial is described in paragraph 1 of the complaint as bounded " northerly on a roadway leading westerly from Trinity Street through Bushnell Park and known as the southerly roadway in Bushnell Park, about 200 feet; easterly on Trinity Street about 75 feet; southerly on land conveyed to the plaintiff by the trustees of Trinity College, and devoted by the plaintiff to the purposes of a site for the State Capitol, about 200 feet; and westerly on a walk running practically parallel with Trinity Street, said walk leading from the said State Capitol to a point on Trinity Street near the Memorial Arch, about 75 feet—said plot of land being on the southeasterly portion of what is known as West Bushnell Park."

The complaint alleges that the plaintiff is the owner and is in the possession of said tract of land, and that the defendants threaten to erect said memorial upon said land.

The defendant Maslen has contracted to erect said memorial, with the other six defendants, who are a committee of a private association composed of persons who were formerly members of said First Connecticut Heavy Artillery.

The defendants by their answer denied the plaintiff's allegations of ownership and possession of said described tract, and in their second defense alleged: (1) that " by special act and resolution of the General Assembly of the State of Connecticut, passed and approved July 9th, 1895, the

regimental association of the First Connecticut Heavy Artillery was authorized and empowered to erect a monument or memorial of its services at such point upon the ' Capitol Grounds ' at Hartford as should be designated by the State comptroller "; (2) that " pursuant to and acting under authority of said resolution, and at the request of the committee of said regimental association, the comptroller did designate a site for such monument or memorial, upon the ' Capitol Grounds,' which site so designated forms a portion of the property within the control and under the exclusive authority and supervision of the State, and is within the limits of the plot of ground described in paragraph one of the plaintiff's complaint . . . ; and (4) that "by authority of said resolution and acting under the direction of the comptroller, the defendants [being the committee of said regimental association and the contractor Maslen employed by them] entered upon the work of erecting, upon the site designated, said memorial, and claim the right to erect the same upon the site so designated by virtue of the special act of the General Assembly above described."

The plaintiff demurred to this second defense, upon the grounds that it did not " allege the conveyances, leases, contracts, or other instruments or means whereby the State acquired exclusive authority and supervision over " said tract; that the allegations that the State had such control, and exclusive authority and supervision, and that the land in question was a part of the " Capitol Grounds," were conclusions of law, and that it did not appear from said defense that the State had any authority to designate a site for the erection of such memorial upon the " Capitol Grounds " or upon the plaintiff's land.

The court having overruled the demurrer, the plaintiff replied, denying the allegations of paragraphs 2 and 4 of the second defense, and upon the issues thus framed the court found the following facts :—

In 1858 the plaintiff acquired title in fee simple to the tract described in the complaint, which, with other lands, was devoted to the purposes of a park called Bushnell Park.

The southerly line of said park, and of the tract in question, was the southerly line of Elm Street produced westerly; said southerly line being between twelve and thirteen feet north of the north steps of the Capitol as it now stands.

On July 17th, 1871, the General Assembly, having on that day passed resolutions authorizing the city of Hartford to issue its bonds to the amount of $1,000,000, for the purpose of defraying the expense of constructing a State-house in the city of Hartford, and of purchasing the land upon which it should be erected, and authorizing said city to hold a special city meeting for the purpose of voting by ballot upon the question of approving the issue of such bonds, passed a resolution, portions of which read as follows:—

"*Resolved by this Assembly:* That Marshall Jewell of Hartford, William D. Bishop of Bridgeport, William A. Buckingham of Norwich, William H. Barnum of Salisbury, and William D. Shipman of Hartford, be, and they hereby are, constituted and appointed a board of commissioners for the State, with ample powers to contract for and fully complete, construct, and erect in the city of Hartford a building suitable for the use of the State as a State-house.

"And said commissioners shall confer with the proper authorities of the city of Hartford, and with them determine upon a site for said building, which shall be provided by said city free of expense to the State, and subject to the use of the State so long as Hartford shall be recognized either as one of the capitals of the State, or as the capital thereof."

July 20th, 1871, an Act was passed as an amendment to the charter of the city of Hartford, providing that "whenever the court of common council of the city of Hartford shall have agreed with the board of commissioners for the erection of a State-house upon a suitable site for the location of said State-house, the said court shall have the right to enter upon, use, and occupy sufficient land for said purpose and for the laying out of suitable grounds around said buildings; *provided,* however, that before entering upon or using said land for the purpose aforesaid, the said court shall agree with the owner or owners thereof . . . as to the amount of damage to be

done thereby ; " and further providing, in case of failure to so agree with such owners, for the taking of land for such purpose, by the court of common council, by condemnation proceedings.

On August 25th, 1871, said board of commissioners for the State were duly notified of the action taken at a special city meeting on the 16th of August, 1871, approving of the issue of bonds by the city of Hartford as authorized by said resolution of the General Assembly of July 17th, 1871.

On August 28th, 1871, the court of common council of the city of Hartford passed the following resolution :—

" Resolved, that the high ground upon the West Park in the city of Hartford, or so much thereof as may be necessary, be, and hereby is offered to the State as a site for the erection of a suitable building in said city for the purposes of the State as a State-house, and that said site be and hereby is offered free of expense to the State, and subject to the use of the State so long as Hartford shall be recognized as one of the capitals of the State, or as the capital thereof.

" Resolved, that the Mayor, Aldermen Sumner and Lawrence, and Councilmen Buckley, Allen, Eustace and Soper, be and hereby are appointed a committee on behalf of this court to confer with the 'Board of Commissioners concerning the State-house,' appointed by the General Assembly at the last session thereof, and to offer for the site of a State-house, the site proposed in the foregoing resolution."

On September 8th, 1871, at a meeting of said board of State commissioners, a formal tender of the high ground of West Park, made by the city through its authorized representatives, was formally accepted on behalf of the State by said commissioners in accordance with the following vote passed at said meeting : " Voted, That the site on the West Park in the city of Hartford, this day tendered by the city through the committee of the court of common council, for the purpose set forth in the resolution this day presented to this board by said committee, through their chairman, his honor, the mayor of said city, be, and the same is hereby accepted by this board."

" The site thus tendered by the city and accepted by the State includes the land north of the capitol building now in controversy. The resolution tendering the above site was never rescinded."

On March 15th, 1872, the court of common council submitted to popular vote for approval, its resolution of that date for the purchase of the grounds known as the Trinity College site, bounded north by the Park, south by College Street, east by Trinity Street, and west by Park River, containing thirteen acres more or less, the same to be devoted to the purposes of a public park, excepting such portion as the court of common council should thereafter offer to the Capitol commissioners for a site for a State-house.

Said resolution having been approved by the voters of the city at a special city meeting, the city received a deed of said Trinity College lands, and in April, 1872, the court of common council appointed a committee, consisting of the mayor, two aldermen and two councilmen, " to formally tender on behalf of the court of common council, to the commissioners appointed by the last legislature to contract for and erect a new State-house in the city of Hartford, so much of the premises recently purchased of the trustees of Trinity College as may be necessary for and acceptable to said commissioners as a suitable site for said State-house."

On May 27th, 1872, the report of this special committee was received and accepted by the court of common council, the only record thereof being : " Board of Aldermen, May 27, 1872. Report of special committee to tender site for a new State-house received and accepted. C. C. Board concurred."

The so-called Trinity College tract lies immediately south of the said West Park, and is connected with the tract described in the complaint, the south line of Elm Street produced westerly being the northerly boundary of said Trinity College tract.

A topographical map of the State-house site, made at the direction of the commissioners for the State, shows a plot of land bounded north by said south line of Elm Street produced; and the State-house, the building of which was

begun in October, 1872, and which was completed and ready for occupancy in January, 1879, was erected wholly upon said Trinity College tract, the north steps of the Capitol being, as before stated, between twelve and thirteen feet south of the south line of the tract described in the complaint.

In 1879, in accordance with the provisions of said resolution of the General Assembly of 1871 appointing said commissioners for the State, all interest of the State in the old State-house at Hartford was duly conveyed to the city of Hartford.

In 1878 the General Assembly directed the Capitol commissioners " to procure proper plans and execute the work for the grading of the grounds around the new Capitol building, and also to prepare proper driveways and approaches to said building, at an expense not exceeding $10,000."

The driveway on the north side of the Capitol, described in the complaint as the northern boundary of the tract in controversy, was constructed in its present location by the said commissioners for the State, at the same time with the laying out of the grounds and the location of the edifice, and has since been maintained by the State at its own expense.

In 1879 the comptroller of the State and the board of park commissioners of the city of Hartford were by resolution of the General Assembly appointed a special committee to grade, lay out, fence, and plant the Capitol grounds, in the manner they deemed suitable, at an expense not exceeding $25,000 ; and further large appropriations were afterwards made for the same purpose. In their final report in 1883, which was accepted by the General Assembly, said committee give a detailed account of their work, describing the boundaries of the Capitol grounds which they had laid out and graded as : " The roadway in front of the State-house on the north, Trinity Street on the east, Capitol Avenue on the south, Broad Street and Park River on the west." The tract described in the complaint is included within these boundaries.

Concerning the tract in question, thus laid out and graded as a part of the Capitol grounds, the trial court says in its finding : It was " tendered to and accepted by the State as a part of its Capitol grounds, and the same is of absolute necessity to the State for convenient and proper approaches to the north entrance of the Capitol building. The State has mapped out these grounds and graded them as a part of the State-house property. Lawns, flower beds, lamp-posts, walks, drains, the north roadway, and the curbing on the south side thereof, have been made and constructed by the State at no small expense. For more than twenty years this piece of land has been in the uninterrupted, undisputed, and continuous control, and under the exclusive authority and supervision of the State, with the full knowledge, consent, and acquiescence of the city."

On July 9th, 1895, the General Assembly passed a resolution, a part of which is as follows :—

" *Resolved by this Assembly :* Section 1. That the regimental association of the First Connecticut Heavy Artillery be and it is hereby authorized to erect a monument or memorial of its services at such point on the Capitol grounds at Hartford as shall be designated by the comptroller; and upon the erection and completion of said monument or memorial under the supervision and to the satisfaction of the quarter-master general, at an expense not less than $1,000, the comptroller shall draw his order on the treasurer in favor of the quartermaster-general for the sum of $1,000 toward the payment for such memorial."

Pursuant to such authority and at the request of said regimental association, the comptroller in 1902 designated a point upon the tract described in the complaint, as a place for the erection of said memorial, and before the commencement of this action the defendants—a committee of said association and the contractor employed by them—had begun the work of erecting said memorial at said point.

The memorial has since been erected upon land near the corner of Trinity Street and Capitol Avenue, upon the land purchased from Trinity College.

Upon these facts judgment was rendered for the defendants.

*William F. Henney* and *Joseph P. Tuttle*, for the appellant (plaintiff).

*Charles Phelps*, for the appellees (defendants).

HALL, J. Apparently no deed or written conveyance of any kind has ever been given to the State, of any right, title or interest in or to either the tract described in the complaint, or to the land purchased from the trustees of Trinity College upon which the State-house now stands.

The right of the State to use the tract upon which the memorial in question is intended to be placed, and the extent of the control which the State may properly exercise over that tract, which are the only questions with which we are at present concerned, can only be determined from the facts above stated, showing the various resolutions passed by the General Assembly, by the court of common council of the city of Hartford, and by its voters at city meetings, the acts of the agents and appointees of the State and city pursuant to such resolutions, and the use and control which the State has been permitted to make of, and exercise over, this tract.

The facts so found show that it was intended that the State might, if necessary, make some use of the plot in controversy.

The tender made and accepted September 8th, 1871, was of the high ground of West Park, or so much thereof as might be necessary as a site for a State-house. The court has found that the site so tendered and accepted embraced the tract in question, and that the resolution tendering the same was never rescinded. For more than twenty years the State has made a certain use of said tract, and exercised a certain control over it, without objection by the city, and apparently without further permission from the city than that given by the tender. The resolution of the court of common council of April, 1872, appointing a committee to

tender to the State commissioners so much of the Trinity College grounds as might be necessary and acceptable to the commissioners as a suitable site for a State-house, did not direct that those grounds should be tendered in lieu of the land previously tendered and accepted. Neither the records of the common council nor those of the State commissioners show that the tender was in fact so made, nor does the court find that such was the fact. While the facts found indicate that the Trinity College tract was tendered with the understanding that the State-house itself should be placed upon that ground, they are not inconsistent with an intention upon the part of the city authorities that the State might use some part of the land first tendered and accepted, if it should be found necessary to use it in order to erect the State-house upon a suitable site.

The understanding of the city and of the State as to what part of the land first tendered might be used by the State, and as to the purpose for which it might be used, is sufficiently clearly shown by the facts before us.

The language of the resolutions passed by the General Assembly, by the common council, and by the citizens of Hartford, show that it was the arrangement between the city and the State that the city should provide for the use of the State, and free of expense to the State, not only the land upon which the State-house was to be placed, but land sufficient for the laying out of suitable grounds around the State-house. This clearly includes both the providing of land sufficient for the construction of suitable approaches to the State-house, and the placing of the land to be used for all of said purposes, so far within the control of the State, as to enable it to properly use and maintain said grounds, for said purposes.

The State availed itself of the offer made by the plaintiff. The State commissioners, in the discharge of their duty, fixed the present site of the State-house a few feet south of the north boundary line of the Trinity College property, as the most suitable one. This location of the State-house made it necessary to use a small strip of the southerly

part of the land first tendered, for the purpose of constructing suitable approaches to the north entrance of the Capitol. In building the driveway on the north of the Capitol, and other ways, as necessary approaches to the Capitol on the north, the tract in question was necessarily included and laid out as a part of the Capitol grounds. It became, in the words of the finding, "of absolute necessity to the State for convenient and proper approaches to the north entrance of the Capitol building."

At great expense to the State, as well as to the city of Hartford, the State-house has been erected upon the site so chosen on the Trinity College tract, and the plot described in the complaint, in connection with other land northerly from the Capitol and south of the north driveway, has been laid out and for many years maintained and used by the State, as stated in the finding, as land required to be used by the State in the proper construction and maintenance of necessary approaches to the Capitol. For this purpose, in the language of the finding, "for more than twenty years this piece of land has been . . . under the exclusive authority and supervision of the State, with the full knowledge, consent, and acquiescence of the city."

We think all these facts show that it was intended that that part of the land first tendered and accepted, which has been thus used by the State, including the tract in controversy, might be used by the State, as necessary for the purpose of constructing suitable approaches on the north of the Capitol, and that for the purposes of such use it might be laid out, maintained and controlled by the State as part of the Capitol grounds. The nature and extent of the right intended to be given to the State may properly be considered as commensurate with the right thus actually enjoyed by the State. *City of Hartford* v. *County of Hartford*, 49 Conn. 554, 562.

The court of common council of Hartford had authority to devote the tract in question to the use by the State for the purposes for which it was accepted. The city procured an unconditioned and unrestricted title to the land in fee.

Having afterwards lawfully dedicated it, with other lands, to the purposes of a public park, it held it in trust for such public use; *Driscoll* v. *New Haven*, 75 Conn. 92, 101; the power to lay out, alter or discontinue such parks, in the manner described in the charter, being vested in the court of common ·council. Whether the city through its common council, or otherwise, could thereafter, without legislative authority, devote such land to another use inconsistent with the first, we have no occasion to inquire. The use to which it was in fact devoted was not inconsistent with its use by the public as a public park. The court has not found, nor does it appear from the facts of record, that the proper enjoyment by the public, of this part of the park, has been, or will in any manner be, curtailed by such use by the State. Before the tender to the State in 1871, the right of the public to use it as a park was subject to such reasonable restrictions, as to the manner of enjoyment, as might be imposed by the common council or the board of park commissioners. Practically the only effect of joining this land to the Capitol grounds was to place under the control of the General Assembly part of a public park which had before been under the management of the city authorities.

But the control of public parks belongs primarily to the State. The authority which the common council or park commissioners of a city may exercise in the control and management of public parks is not derived from the citizens of the municipality within the limits of which such parks are situated, but from the legislature. Such public parks are held not for the sole use of the people of a particular municipality, but for the use of the general public which the legislature represents. Municipalities in controlling and managing such public parks act as governmental agencies, exercising an authority delegated by the State, and are always subject to legislative control. *Commonwealth* v. *Davis*, 162 Mass. 510; *West Chicago Park Comrs.* v. *McMullen*, 134 Ill. 170; *People ex. rel. Bryant* v. *Holladay*, 93 Cal. 241. Regarding, as we do, the use which the State has made of the tract in question as consistent with that to which it was

first dedicated, the offer of such land to the State as a part of the Capitol grounds was no more than a voluntary surrender to the State of the control which primarily belongs to the State over such property, and which the city had before exercised with the consent, or by the direction, of the State.

If, on the other hand, such use by the State ought to be considered as inconsistent with that to which this land was first dedicated, the legislature possessed the power to authorize the court of common council to devote it to such other and higher public purpose as would render its enjoyment by the public more extended and general; and such authority might be granted either by express words or by necessary implication. *Evergreen Cemetery Asso.* v. *New Haven*, 43 Conn. 234, 242; *Driscoll* v. *New Haven*, 75 id. 92, 101. Such authority from the State is sufficiently shown by the language of the resolutions of the General Assembly above referred to, by the fact that the land was tendered to the State itself for such use, and that it was accepted and used by the State for that purpose. It was not necessary that the question whether the land should be so used should be submitted to a popular vote. *Whitney* v. *New Haven*, 58 Conn. 450, 459.

By the tender and acceptance as before described, it was evidently not intended to convey the fee of this property to the State. Whether such tender and acceptance be regarded as a transfer or surrender of the control of a portion of a public park to the State, or as a dedication of the land to a new public use, no deed or written conveyance was required to be given to render such transfer or dedication effective. The resolutions of the court of common council, of the General Assembly, and the acts of the officers and agents of the city and of the State, clearly showing not only an intention on the one hand that the land should be used for this public purpose, and on the other to accept it for such public use, but a long continued use for such purpose, acquiesced in by the city, were sufficient to constitute either a valid express or implied dedication and transfer of the control of said property for such purpose. *Kent* v. *Pratt*, 73 Conn.

573, 578 ; *Pierce* v. *Roberts*, 57 id. 31, 39 ; *Meriden* v. *Camp*, 46 id. 284, 287.

The erection of the memorial in question is a proper exercise of the right so surrendered to the State to control and manage this land as a part of the Capitol grounds. The same power which is given by statute to the city and its board of park commissioners, "to lay out, . . . plant and otherwise at their own discretion improve and adorn the parks," may, by the State, through the General Assembly, be exercised over this land as a part of a public park. It is neither alleged in the complaint nor shown by the finding that the monument to be erected is in any respect inappropriate for such public grounds, or that its character or its proposed location will in any way interfere with the enjoyment of such grounds by the public.

In authorizing the erection of this memorial, the State is not granting to the regimental association a right to occupy or control a part of the Capitol grounds. The memorial is to be erected by the association for the State, under the supervision of a State officer, and either wholly or in part at the State's expense. After its erection upon the Capitol grounds it becomes the property of the State, with no interest in it or right of control over it remaining in the association.

The trial court admitted in evidence, against the plaintiff's objection, a diagram showing the Capitol and grounds as they existed at the time of the trial, and as they had been occupied by the State ; the resolution of the common council of August 28th, 1871, tendering to the state commissioners the high ground of West Park, and the minutes of the State commissioners of September 8th, 1871, accepting the same ; the resolution of the court of common council of March 15th, 1872, submitting to popular vote the question of purchasing the Trinity College ground, with the record of the city meeting of March 19th, 1872, authorizing the purchase of the same ; the reports to the General Assembly in 1882 and 1883 of the commissioners appointed to lay out and grade and complete roads and walks in the Capitol grounds ; the

resolution of the court of common council in accepting the opinion of the city attorney as to the duty of the State to repair the roadway north of the Capitol, and directing that notice be given of the same to the State comptroller; and testimony of State comptrollers and superintendents of the Capitol as to grounds over which they had exercised control.

The substance of the objection made to such evidence was that these facts did not tend to prove that the State possessed the right to control the tract in question as a part of the Capitol grounds. All of this evidence was admissible as tending to prove that the State had used and controlled the tract in question as a part of the Capitol grounds, with either the express or implied consent of the city.

For the purpose of proving that the tender to the State of the Trinity College grounds on the 27th of May, 1872, was a tender of such grounds in lieu of the high ground of West Park, tendered August 28th, 1871, the plaintiff, having offered evidence showing that the court of common council on January 22d, 1872, had received a communication from a meeting of citizens, at which there was an animated discussion, and that the court of common council in the following March voted to purchase said Trinity College grounds, inquired of witnesses who were present at said city meeting what the animated discussion was about, with the view of showing as a matter of traditionary evidence the general understanding of the citizens as to the substitution of one site for the other. For the same purpose the plaintiff also offered in evidence an article from the Hartford Courant of May 28th, 1872, stating that the second site had on the previous day been tendered and accepted in lieu of the site first tendered.

This evidence was properly excluded by the trial court. This was not a case for the admission of what is termed traditionary evidence. The records of the action of the citizens at the meetings of March 19th and March 30th, 1872, and of the court of common council of March 11th, March 15th, April 22d and May 27th, 1872, show suffi-

Hartford v. Maslen.

ciently clearly the purpose for which the Trinity College grounds were purchased by the city, the tender which the committee of the court of common council were directed to make of these grounds, and that the committee in making the tender did all that they were authorized to do.

The evidence was apparently not offered for the purpose of proving that the second tender when made was actually expressed to be in lieu of the first, but to show that the citizens of Hartford understood that such was the real purpose for which it was to be, and was in fact, made. As the facts before stated, showing the purpose and intention of the parties interested in the purchase and tender of Trinity College property were before the court, it was the duty of the court to determine the purpose of the tender and its effect upon the rights of such parties, from such facts themselves, rather than from statements of citizens at a public meeting, of their understanding of the purpose for which the second tender was to be made, or from the understanding of the public as to the legal effect of the second tender.

If the evidence was offered to prove that the second tender was in fact expressly made in lieu of the first, it was open to the further objection that it was hearsay.

The exception to the general rule excluding hearsay evidence, which permits in certain cases the reception of what is called traditionary evidence concerning facts of public or general interest affecting public or private rights, is limited to proof of declarations of deceased persons, or persons supposed to be dead or who are not available as witnesses, as to ancient rights of which they are presumed or are shown to have had competent knowledge, and which rights are incapable of proof in the ordinary way by living witnesses ; and this exception is not to be favored or extended. 1 Greenleaf on Ev. (13th ed.) §§ 128-130 ; Thayer's Cases on Ev. pp. 409-428 ; *Merwin* v. *Morris*, 71 Conn. 555, 572 ; *Southwest School District* v. *Williams*, 48 id. 505, 507 ; *Wooster* v. *Butler*, 13 id. 309, 315 ; *Brown* v. *Crandall*, 11 id. 92, 94 ; *Higley* v. *Bidwell*, 9 id. 447, 451.

The discussion at the public meeting of January, 1872,

occurred before the second tender was made, and could not therefore show in what form it was in fact made.

The article from the " Courant " does not show a declaration concerning an ancient matter by an ancient person having knowledge of the fact of which he spoke, and who could not be called as a witness. It does not appear who wrote the article, nor that its author had either personal knowledge of the fact of which he wrote, or had heard declarations concerning it from persons having such knowledge ; nor does it appear that the author of the article could not himself have been called as a witness, nor that there were not other living witnesses who might have testified as to how the second tender was in fact made.

The trial court did not err in overruling the plaintiff's demurrer to the second defense. There were no " conveyances, leases, contracts or other instruments," showing how the State acquired exclusive authority and supervision over the land described in the complaint, the omission to plead which rendered the second defense demurrable. Further discussion of that ruling is, however, unnecessary, since the facts relied on by the defendants as proof of such control and authority have been found by the trial court, and the ruling of that court by its final judgment, as to the sufficiency of such facts for that purpose, is the principal question raised by this appeal.

The fact claimed by the plaintiff to be shown by the evidence before us, that the present location of the memorial near the corner of Capitol Avenue and Trinity Street is only temporary, and that it is still intended to place it upon the site originally designated, could not, if made a part of the finding, affect the plaintiff's right to the relief asked for. It is therefore unnecessary to consider the plaintiff's request for a correction of the finding in respect to that fact.

There is no error.

In this opinion the other judges concurred.